# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ANOTHER STEP FORWARD and THE
HEALING PLACE OF DETROIT,

              Plaintiffs,

v.

STATE FARM AUTOMOBILE INSURANCE
COMPANY

              Defendant.

_____/

Case Number: 06-CV-15250

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

## OPINION AND ORDER (1) LIFTING STAY AND
## (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now before the Court is Defendant State Farm Mutual Automobile Insurance Company's

("Defendant's") Motion to Lift the Stay of Proceedings and Motion for Determination of Summary

Judgment.  A hearing on the matter was held on February 18, 2009.  For the following reasons, the

Court LIFTS the Stay of Proceedings and GRANTS Defendant's Motion for Summary Judgment.

## I.      BACKGROUND

Plaintiffs filed this case against Defendant, a no-fault insurer, as a result of Defendant's

refusal to pay Plaintiffs' requests for services rendered to the insured, Michael Morgan.  Plaintiffs

are Michigan corporations engaged in the business of providing rehabilitation services to individuals

who suffer from traumatic brain injuries, addictive disorders and psychiatric disorders.  (Compl. ¶

1).  Defendant is an Illinois Insurance Company with its principal place of business in the city of

Bloomington, Illinois.  (Removal ¶ 4).

On February 18, 1995, Defendant's insured, Morgan, was involved in a motor vehicle

accident in which he sustained a traumatic brain injury.  (Compl. ¶ 11).  Morgan was insured under the terms and conditions of his automobile insurance policy and the Michigan No-Fault Act, Mich. Comp. Laws 500.3101, *et seq*.  (*Id*. ¶ 9).  Morgan made a claim with Defendant under claim number 22K129030.  (*Id*. ¶ 11).

It is undisputed that Morgan suffered from a substance abuse problem before the accident. (Dkt. No. 41, Ex. C, Special Tree Psychosocial History).

After the accident, Morgan received two hours of attendant care per day, seven days a week, pursuant to a doctor's prescription.  (*Id*. at 4; Ex. Q, Letter from Dr. Bittar to Defendant).  On September 7, 2005, Morgan was prescribed 24-hour attendant care and directed to attend Plaintiffs' treatment facility for "specialized and intensive treatment."  (Dkt. No. 36 at 3; Compl. ¶ 12). Plaintiffs are licensed as a residential substance abuse facility.  (Dkt. No. 36 ¶ 8).

Morgan was admitted as an inpatient to Plaintiffs' facility on or about October 24, 2005. (Compl. ¶ 12).  Plaintiffs explain that "The Healing Place treats victims of brain injury who have co-occurring substance abuse disorders."  (Dkt. No. 41 at 5).  Within 30 days of admittance, Plaintiffs provided Defendant with invoices, proof of the fact and amount of medical services provided to Morgan, including his records.  (Compl. ¶¶ 14-16).  Plaintiffs also included instructions to contact Plaintiffs in writing if Defendant disputed the nature of the services provided.  (*Id*. ¶ 16).

Plaintiffs allege that Defendant failed to tender payment or provide a written explanation for the basis of its failure to pay.  (*Id*. ¶ 18).

On October 31, 2007, Plaintiffs filed a civil action in the circuit court for Wayne County, Michigan, and on November 27, 2007, Defendant removed the action to this Court.

Defendant filed a Motion for Summary Judgment on January 2, 2008.  That motion relied

heavily upon the Michigan Court of Appeals decision in *Healing Place v. Allstate Ins. Co.*, 277 Mich. App. 51 (2007) [hereinafter "Naylor"].  Shortly after Defendant filed its Motion, on January 21, 2008, the remaining plaintiffs in *Naylor*—New Start, Inc. ("New Start"), The Healing Place, Ltd. ("THP, Ltd."), and The Healing Place at North Oakland Medical Center, Inc. ("THP at NOMC")— filed a motion for leave to file an appeal in the Michigan Supreme Court.

On April 10, 2008, this Court entered an Order to Stay the Proceedings of this case pending the outcome of the Michigan Supreme Court's final decision in *Naylor*.  ("April 10, 2008 Order").

On July 23, 2008, the Michigan Supreme Court denied the application for leave to appeal the Court of Appeals' judgment in *Naylor* because the justices were "not persuaded that the questions presented should be reviewed by" the court.  *Healing Place v. Allstate Ins. Co.*, 752 N.W.2d 464 (Mich. 2008).

Defendant now moves this Court to lift the stay of proceeding and provide a determination on its outstanding Motion for Summary Judgment.

## II.   ANALYSIS

In the present action, Plaintiffs first oppose Defendant's motion to lift the stay of proceedings and then next argues that *Naylor* is "not dispositive" of the issues raised here.

### A.   Stay of Proceedings

As indicated above, the Court's April 10, 2008 Order stayed the proceedings in this case pending the outcome of the Michigan Supreme Court's final disposition in *Naylor*.  On July 23, 2008, the Michigan Supreme Court denied the leave to appeal the *Naylor* ruling.  Thus, the condition for this Court's stay was satisfied.  Nonetheless, in their briefs, and then again at the February 18, 2008 hearing, Plaintiffs requested that the Court deny Defendant's Motion to Lift Stay of

3

Proceedings pending the outcome of a separate case, *The Healing Place, Ltd v. Farm Bureau Mut. Ins. Co of Mich.*, Case No. 286050 (Mich. Ct. App. filed June 17, 2008) [hereinafter "Wallace"]. Plaintiffs claim that *Wallace* seeks to overturn the *Naylor* decision through presenting a record similar to that in this case and that judicial economy suggests this Court wait for the final disposition of that case. Plaintiffs, however, have not provided the Court with any detail on the *Wallace* case other than that oral argument has been set in front of the Michigan Court of Appeals. Accordingly, at the instant hearing, this Court found no reason for staying the proceedings any further and lifted the stay of proceedings. The Court then heard arguments on the remaining issues in this case.

### B.    Collateral Estoppel

In its April 10, 2008 Opinion and Order Staying Action, this Court found that collateral estoppel applied to the instant case. Specifically, the Court found the essential determinations in this action—whether the Plaintiffs are properly licensed and whether this lack of licensure prohibits compensation under the No-Fault Act—had been previously determined in *Naylor*.

In *Naylor*, Plaintiffs pursued a first party action against a no-fault insurance company over no-fault automobile personal protection insurance benefits. *Id.* at 53. The insured, Edgar Naylor, had sustained a brain injury after being struck by a car while riding a bicycle. *Id.* at 54. In addition to the brain injury, Naylor also had addiction problems which predated the accident. *Id.* Naylor was eventually treated through a program offered by New Start, THP, Ltd., and THP at NOMC. *Id.* The services he received were "part of an integrated treatment for brain injury, psychiatric disorders and substance abuse." *Id.* Allstate Insurance denied Naylor's claims for benefits based in part because it found the services were not "lawfully rendered" pursuant to the No-Fault Act. *Id.*

The essential issue in *Naylor* was whether the services were "lawfully rendered" under

4

Mich. Comp. Laws § 500.3157.  The Michigan Court of Appeals explained:

> the plain language of Mich. Comp. Laws § 500.3157 requires that before compensation for providing reasonable and necessary services can be obtained, the provider of treatment, whether natural person or an institution, must be licensed in order to be "lawfully rendering treatment."  If both the individual and the institution were each required to be licensed and either was not, the "lawfully render[ed]" requirement is unsatisfied.

*Id*. at 58.

To this end, Allstate Insurance submitted documentary evidence which showed THP at NOMC was "required to be licensed as a psychiatric hospital unit, that [THP] had no license at all, and that New Start provided services that required a license to operate an adult foster-care facility." *Id*. at 57.  Allstate also "presented the deposition testimony of Dr. Thomas Kane and Roman Frankel establishing that the services rendered were in the nature of psychiatric services and adult foster care (*i.e.* outside the operating licenses)."  *Id*. at 58.

The Michigan Court of Appeals ultimately held that THP, Ltd., THP at NOMC and New Start were not properly licensed, and as a result the services at issue were not "legally rendered" under the No-Fault Act and not compensable.  *Id*. at 58.

Plaintiffs do not specifically challenge this Court's finding that collateral estoppel applies to this case or that issues here differ in any way from those addressed in *Naylor*.  Instead, Plaintiffs argue that there are a myriad of reasons why the Naylor case is "not dispositive" of the instant case.

In Michigan, collateral estoppel applies when a party can establish three elements: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel. *Monat v. State Farm Ins. Co.*, 469 Mich. 679,

682-84 (2004).  "Mutuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, *or in privy to a party*, in the previous action. In other words, 'the estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him.'" *Id.* (quoting *Lichon v. Am. Universal Ins. Co.*, 435 Mich. 408, 427 (1990) (emphasis added)).   But, "where collateral estoppel is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue, mutuality is not required."  *Id.* at 680–81.

### 1.    Differences in Parties

First, Plaintiffs argue—without providing any further detail or analysis—that the parties in this case and those in *Naylor* are different.  The plaintiffs in *Naylor* were: THP at NOMC, THP, Ltd., New Start, and Edward Naylor; whereas, the plaintiffs in the instant action are: Another Step Forward and THP of Detroit.  In addition, the Defendant in *Naylor* was Allstate and the Defendant here is State Farm.

Although Plaintiff only spent a paragraph elucidating this point, the Court does not downplay its significance.  As set forth above, there must be a mutuality of the parties but that requirement is relaxed "where collateral estoppel is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue."  *Monat*, 469 Mich. 680–81.  In its April 10, 2008 Order, this Court did not expound on the collateral estoppel issue; it merely stayed the action in anticipation of the Michigan Supreme Court's determination of *Naylor*.  The Court clarifies its finding now that Another Step Forward and THP of Detroit are in privity with, THP at NOMC, THP, Ltd., or New Start.

To be in privity is to be so identified in interest with another party that the first

6

> litigant represents the same legal right that the later litigant is trying to assert. The outer limit of the doctrine traditionally requires both a "substantial identity of interests" and a "working functional relationship" in which the interests of the nonparty are presented and protected by the party in the litigation.

*Adair v. State of Michigan*, 470 Mich. 105, 122 (2004) (internal citations omitted).

In their Complaint, Plaintiffs allege that they "are engaged in the business of providing rehabilitation services to individuals suffering from traumatic brain injury, addictive disorders and/or psychiatric disorders." (Compl. ¶ 1). This is the same business as the plaintiffs in *Naylor*.

In addition, the affidavit of Roman Frankel provides that he was a shareholder and officer of all five entities. (Pls.' Resp. ¶ 7). Frankel also describes how both THP of NOMC and THP of Detroit were licensed residential substance abuse facilities by the State of Michigan. Mr. Frankel depicts how both facilities provided services that went beyond those provided in a residential substance abuse facility but that did not rise to the level of an adult foster care facility or psychiatric hospital. Mr. Frankel also describes how THP of Detroit was opened after THP at NOMC was closed. Mr. Frankel similarly depicts Another Step Forward as a facility that provides services for which there is no applicable licensure available at the facility level through the State of Michigan. Hence, not only do the plaintiffs in both actions have similar ownership and management, but also allegedly provide services for which there are no applicable facility licenses.

Plaintiffs' briefs also do not provide any real distinction between the Plaintiffs here and those in *Naylor*. In at least two of the affidavits attached to Plaintiffs' Response, the affiant refers plainly to "The Healing Place" (PLS.' Resp., Ex. G, Shiener Aff. ¶ III; Ex. H., Keener Aff. ¶ III) without providing any differentiation among THP at NOMC, THP of Detroit, or THP, Ltd. In addition, Plaintiffs' Response specifically argues that THP, Ltd.—a plaintiff in the *Naylor* case but not in this

case—is not required to be licensed as an Adult Foster Care Facility.  In fact, Plaintiffs seem to admit that THP, Ltd., THP at NOMC, and New Start are in privity with Plaintiffs when they argue for another stay of the instant proceedings pending a determination of the *Wallace* case, in which THP, Ltd., THP at NOMC, and New Start are parties.  Finally, the Plaintiffs in *Naylor* were represented by the same attorney as in this case.  Given Mr. Frankel's common ownership in and management of the facilities, the admittedly common legal issues among the facilities, and Plaintiffs' failure to distinguish themselves from the *Naylor* plaintiffs, the Court finds that the Plaintiffs in this case are in sufficient privity to those in the *Naylor* case.

### 2.      Differences in Record

Second, Plaintiffs contend that notwithstanding the *Naylor* decision, the record here contains evidence, which was not part of the *Naylor* record, which compels a different result, and that the *Naylor* court did not reach a determination on the licensing issues.  Plaintiffs do not contend that the issues litigated in the *Naylor* case are different from those in the present case.  The Michigan Supreme Court's decision in *Monat* provides guidance as to the standards this Court considers in determining whether the findings in *Naylor* preclude relitigating of those dispositive issues here.

In *Monat*, the Michigan Supreme Court adopted the Restatement (Second) of Judgments approach to analyzing issue preclusion.  Section 28 of the Restatement lists exceptions to the general rule of issue preclusion, and Section 29 discusses issue preclusion in subsequent litigation with a party other than the party in the original suit.  Under section 29, "a party precluded from relitigating an issue with an opposing party . . . is also precluded from doing so with another person unless the fact that he lacked a full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue."  Thus, because the parties

8

are in privity and because the issues in *Naylor* and those in the instant action are the same, Plaintiff

must show that he lacked a full and fair opportunity to litigate the issues in *Naylor*.  Section 29 lists

several circumstances a court should consider in determining whether litigation of an issue is

precluded:

> (1) Treating the issue as conclusively determined would be incompatible with an applicable scheme of administering the remedies in the actions involved;
>
> (2) The forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not available in the first action and could likely result in the issue being differently determined;
>
> (3) The person seeking to invoke favorable preclusion, or to avoid unfavorable preclusion, could have effected joinder in the first action between himself and his present adversary;
>
> (4) The determination relied on as preclusive was itself inconsistent with another determination of the same issue;
>
> (5) The prior determination may have been affected by relationships among the parties to the first action that are not present in the subsequent action, or apparently was based on a compromise verdict or finding;
>
> (6) Treating the issue as conclusively determined may complicate determination of issues in the subsequent action or prejudice the interest of another party thereto;
>
> (7) The issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based;
>
> (8) Other compelling circumstances make it appropriate that the party be permitted to relitigate the issue.

In addition to these factors, Section 29 incorporates the circumstances listed in Section 28, in which

issue preclusion may not be warranted.  Those circumstances include where:

> (1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action; or
>
> (2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws; or

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.

As noted by the *Monat* court, the United States Supreme Court has provided the following observation regarding a court's determination of this issue:

> Determining whether a [party] has had a full and fair chance to litigate [an issue] in an earlier case is of necessity not a simple matter [because] . . . as so often is the case, no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, [the] decision will necessarily rest on the trial courts' sense of justice and equity.

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333–34 (1971).

Plaintiffs have not shown that the facts and circumstance present in this case justify relitigating of the dispositive issues determined in *Naylor*.  First, Plaintiffs' argument that the evidence presented in this case compels a different result than that in *Naylor* is without merit, as Plaintiffs have not established that the *Naylor* plaintiffs lacked a full and fair opportunity to litigate the issues in that case.  Plaintiffs have not presented any evidence indicating that the *Naylor* plaintiffs were, in any way, hindered from pursuing their claims.  While the *Naylor* court did note that "plaintiffs presented only a paucity of evidence to rebut Allstate's arguments," 277 Mich. App.

10

at 58, such a finding does not mean that the plaintiffs lacked a full and fair opportunity to litigate the issues. In fact, it tends to show the opposite—that plaintiffs had an ample opportunity but simply failed to do so.

Likewise, Plaintiff's argument that the *Naylor* court did not reach a determination on the license issue is also without merit. In *Naylor*, the Michigan Court of Appeals specifically stated that it relied on Allstate's presentation of deposition testimony from Dr. Thomas Kane and Roman Frankel, which established that "the services rendered were in the nature of psychiatric and adult foster care (i.e., outside the operative licensure)," in finding that Allstate met their burden as the moving party. *Id.* The Court went on to hold "on the existing record and a matter of law, that the services provided by plaintiffs were not 'lawfully render[ed],' MCL 500.3157, because [Plaintiffs] were not licensed to perform the services rendered." *Id.* Thus, contrary to Plaintiffs' assertions, the *Naylor* court found that the plaintiffs provided psychiatric and/or adult foster care services and that they had no license for such services. Moreover, even the dissent in *Naylor*, which Plaintiffs cite in their brief, found that the evidence in that case "was sufficient to support an interference that THP at NOMC operated as a psychiatric unit even though it only had a license to operate as a residential substance-abuse program." *Id.* at 66 (Smolenksi, J., dissenting).

### 3.      Effect of the Michigan Supreme Court's Recent Opinion in *Miller*

Plaintiff next argues that the Michigan Supreme Court's recent ruling in *Miller v. Allstate Ins. Co.*, 481 Mich. 601, 604 (2008) is controlling on the issues before the Court.

The *Miller* court held that a defendant insurance company lacks statutory standing to challenge a plaintiff physical therapy facility's corporate status under section 121 of the Business Corporations Act ("BCA") because that section grants the power to challenge corporate status solely

11

to the Attorney General. *Id*. at 605. In that case, plaintiff William Miller underwent physical therapy at PT Works, Inc. after he was injured in two separate car accidents.  *Id*.  PT Works billed Miller's insurance company, Allstate Insurance Company, but Allstate refused to pay.  *Id*. at 605.  Miller filed suit against Allstate but assigned his claim to PT Works, which then filed a claim against Allstate as cross-plaintiff.  *Id*.  Defendant Allstate moved for summary disposition, claiming (1) that PT Works was unlawfully incorporated under the BCA because PT Works was required to incorporate under the Professional Services Corporation Act and (2) that as a result, Allstate did not have to provide no-fault benefits because the treatment was not "lawfully render[ed]" under M.C.L. § 500.3157.  *Id*.  Because Defendant was challenging the lawfulness of incorporation of PT Works under the BCA, the Court reasoned that the initial and relevant question was whether the BCA granted Allstate the authority to challenge the incorporation in the first place—that is, whether Allstate had statutory standing.  *Id*. at 610. The court found that the BCA gave the Michigan Attorney General the sole authority to challenge whether a corporation has been properly incorporated under the BCA.  *Id*. at 611.  The BCA specifically provides that corporate existence begins on the effective dates of the articles of incorporation and that "[f]iling is conclusive evidence that . . . the corporation has been formed under this act, except in an action or special proceeding by the attorney general."  M.C.L. § 450.1221.  In addition, the court held that it was irrelevant that Allstate was challenging the PT Works's incorporation as an affirmative defense, as Allstate's challenge encompassed the same lack of statutory authority as if it had been the plaintiff in the suit. Accordingly, the Court held that Allstate lacked the statutory authority to challenge the corporate status of PT Works.

Here, Plaintiffs contend that Defendant's challenge to the propriety of Plaintiff's licensure

as an affirmative defense to payment of otherwise payable expenses due under the No-Fault Act is barred because Defendant—just like insurer defendant in *Miller*—does not have statutory standing to assert this defense. Plaintiffs argue that like the BCA discussed in *Miller*, the provisions governing licensure of facilities like those of the Plaintiffs are enforced by regulatory agencies and the Michigan Attorney General.

In Michigan, The Adult Foster Care Licensing Act ("Act") and the Mental Health Code ("Code") govern the licensing requirements for mental health and adult foster care facilities—the type of facilities at issue in *Naylor* and in the instant action.

Under Section 137 of the Code, "[a] person shall not construct, establish, or maintain psychiatric hospital,[1] psychiatric unit,[2] or psychiatric partial hospitalization[3] program or use the [those] terms . . . without first obtaining a license." M.C.L. § 330.1137.  According to Section 149, the Director of Mental Health "may maintain action in the name of the people of the state to restrain or prevent the construction, establishment, management, or operation of a psychiatric hospital,

---

[1] A "psychiatric hospital" is defined as "an inpatient program operated by the department for the treatment of individuals with serious mental illness or serious emotional disturbance." M.C.L. § 330.1100b(7).

[2] "'Psychiatric unit' means a unit of a general hospital that provides inpatient services for individuals with serious mental illness or serious emotional disturbance," M.C.L. § 330.1100c(9), where general hospital is defined as "a facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician." M.C.L. § 333.20106(5).

[3] "'Psychiatric partial hospitalization program' means a nonresidential treatment program that provides psychiatric, psychological, social, occupational, nursing, music therapy, and therapeutic recreational services under the supervision of a physician to adults diagnosed as having serious mental illness . . . who do not require 24-hour continuous  mental health care, and that is affiliated with a psychiatric hospital or psychiatric unit to which clients may be transferred if they need inpatient psychiatric care."  M.C.L. § 330.1100c(8).

psychiatric unit, or psychiatric partial hospitalization program without a license." M.C.L. § 330.1149.  The operation of psychiatric facility without a license is a misdemeanor. M.C.L. § 330.1150.

Under Section 13 of the Act, "[a] person, partnership, corporation, [or] association . . . shall not establish or maintain an adult foster care facility unless licensed by the department." M.C.L. § 400.713(1).   The Act defines an adult foster care facility as an entity that provides foster care to adults, where foster care is defined as "the provision of supervision, personal care, and protection in addition to room and board, for 24 hours a day, 5 or more days a week, and for 2 or more consecutive weeks for compensation."  M.C.L. §§ 400.703(4), 400.704(6). These facilities are "for adults who are aged, mentally ill, developmentally disabled, or physically disabled who require supervision on an ongoing basis but who do not require continuous nursing care."  M.C.L. § 400.703(4). They do not include establishments commonly described as an alcohol or substance abuse rehabilitation center or other rooming houses that do not provide foster care.  *See* M.C.L. § 400.703(4)(h).

"If the [Family Independent Agency ("FIA")] determines that an unlicensed facility is an adult foster care facility, the [FIA] shall notify the owner or operator of the facility that it is required to be licensed under this act." M.C.L. § 400.713(12).  If a person does not apply for a license within thirty days of receiving notice from the FIA, then the person is subject to a "misdemeanor, punishable by imprisonment for not more than 2 years or a fine of not more than $50,000.00, or both."  M.C.L. § 400.713(13).  The Act also provides for a mechanism for individuals to request an investigation of a facility to determine whether it is operating as an adult foster care facility without a license.  M.C.L. § 400.724(1).  If the complainant is dissatisfied with the determination

14

or investigation by the FIA, the complainant may request a hearing with the director of the FIA. M.C.L. § 400.724(8). If the complainant is dissatisfied with the director's decision at the hearing, then the complainant may appeal to the circuit court of the county in which the complainant resides. *Id.*[4] Finally, under section 30 of the Act, "the attorney general, on behalf of the [FIA], may seek an injunction against an adult foster care facility" operating without a license or where the facility otherwise is in violation of the Act.  M.C.L. § 400.730.

Thus, similar to the enforcement of corporate status under BCA, the enforcement of licensing requirements for mental health and adult foster care facilities is relegated to regulatory agencies and the Michigan Attorney General.  Unlike the BCA, however, where there is a clear irrebuttable presumption of proper incorporation upon the filing of articles of incorporation, there is no such irrebuttable presumption—either in favor or against—the licensure of mental health and adult foster care facilities.  That is, in *Miller*, the Michigan Supreme Court noted that under the BCA, the filing of the articles of incorporation serve as "conclusive evidence" that an entity is properly formed and that a court cannot "conclude otherwise, except as a consequence of a suit brought by the Attorney Generally."  *Miller*, 481 Mich. at 611.  But under the Code or the Act, there is not such an easily ascertainable standard that prevents an entity, like Defendant, from asserting an affirmative defense of improper licensure.  Therefore, the Court finds that Defendant has statutory standing to challenge whether Plaintiff is in violation of the Act or the Code.

Accordingly, as indicated in the April 10, 2008, Plaintiffs are collaterally estopped from relitigating the issues decided in *Naylor*, specifically that the Plaintiffs are not properly licensed for

---

[4] Plaintiff also cites M.C.L. § 400.725 as applicable.  That section, however, only applies to persons aggrieved under sections 22 and 23 of the Act, which are not applicable under the current facts.

the services they provided and that as a result, those services are not compensable under the No-Fault Act.

### C.      Defendant's Motion for Summary Judgment

#### 1.      Standard of Review: Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Conversely,

16

where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### C. Breach of Contract

Defendant argues that Plaintiffs' claim of breach of contract fails as Plaintiffs have not alleged a contractual relationship with Defendant in the Complaint. Defendant contends that pursuant to Michigan law, a no-fault service provider may pursue a cause of action against a no-fault insurer for recovery of benefits owed, but this duty arises from a statutory duty, not from privity of contract. Defendant, therefore, avers that Plaintiffs' only recovery may be through an action for breach of statutory duties, not breach of contract.

Plaintiffs respond that there is privity of contract between Plaintiffs and Defendant because

17

on October 24, 2005, Defendant's insured assigned Plaintiffs any and all rights to pursue a claim for unpaid medical expenses against Defendant.  (Dkt. No. 41 Ex. A, Assignment).

Initially, the Court notes that the Assignment that Plaintiffs have submitted to the Court is not what Plaintiffs purport it to be; more specifically; Plaintiffs have produced a document in which Defendant's insured has assigned his rights to pursue a first party cause of action against "All State" to Plaintiffs.  The Defendant in the instant action is <u>State Farm Mutual Automobile Insurance</u>.  Therefore, Plaintiffs' assignation is not valid against Defendant, nor does it create privity of contract between Plaintiffs and Defendant.

Plaintiffs have set forth no other argument or evidence to support their claim of Breach of Contract against Defendant, nor did Plaintiffs allege a contractual relationship with Defendant in their Complaint.  Indeed, Plaintiffs admit that they do not have any contractual relationship with Defendant outside of this alleged assignment of rights.  (Dkt. No. 41, ¶ 3).  Even if they had, though, under *Naylor*, Plaintiffs are not entitled to remuneration for the services they provided.  Therefore, the Court grants summary judgment to Defendant on this claim as no contract exists.

**D.    Tortious Interference with a Contractual Relationship**

Plaintiffs claim Defendant tortiously interfered with their contractual and business relationships with Defendant's insured and other patients.  (Compl. ¶¶ 25-30).

Pursuant to Michigan law, tortious interference with a business relationship requires evidence of "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted."  *PT Today, Inc. v. Comm'r of the Office of*

18

*Finance & Ins. Serv.*, 270 Mich. App. 110, 148 (Mich. Ct. App. 2006). Plaintiffs must also evidence that a "business expectancy is reasonable likely or probable expectation." *Id*. at 150.

Defendant argues that Plaintiffs' claim should fail because Plaintiffs cannot show any genuine issues of material fact regarding the second and the third elements; knowledge of the relationship or expectancy on the part of the interferer and that there was wrongful intentional interference.

Plaintiffs specifically allege that Defendant "intentionally engaged in a campaign to interfere with Plaintiff's ability to maintain existing relationships with patients and to secure referrals from other sources such as other facilities or case managers." (Dkt. No. 41 at 17). Plaintiffs contend that at a minimum, Defendant interfered with their business relationship or expectancy with: Defendant's insured, Sheila Warren and Gary Raymond. Plaintiff offers the deposition testimony of Susan Higginbottom, Gary Raymond's mother, from a separate case involving the same parties. (Dkt. No. 41, Ex. O, Higginbottom Dep.). Plaintiffs assert that Ms. Higginbottom testified that Defendant's adjuster, Paula Couch, and claims manager, Ron Ikens, "contacted her on several occasions" to tell her that Plaintiffs were not licensed to deal with her son's mental problem. (*Id*. at 18). Plaintiffs also contend that Defendant "repeatedly threatened Ms. Higginbottom with the fact that it was not going to pay for her son's treatment if he remained at The Healing Place". (*Id*.)

First, the Court notes that Plaintiffs have failed to show or allege any relationship, expectancy or contract with the Sheila Warren, whom they identify as a patient whose patronage they lost as a result of Defendant's actions. Plaintiffs have also failed to provide anything besides one conclusory statement that Defendant attempted to interfere with "referrals from other sources

19

such as other facilities or case managers."[5]  (Dkt. No. 41 at 17).

Therefore, Plaintiffs have only alleged damages resulting from the loss of Defendant's insured, Michael Morgan and Gary Raymond.  To this end, Plaintiffs have failed to evidence any contract between Defendant's insured and Plaintiffs, nor submitted any evidence, testimonial or otherwise regarding the reasonable likelihood that their business relationship would have continued but for Defendant's alleged actions.[6]  As to the record regarding Gary Raymond, the Court takes issue with Plaintiffs' misleading construal of the record.  As apparent from the her deposition testimony, Ms. Higginbottom asserts she was contacted <u>once</u> by Paula Couch and <u>once</u> by Ron Ikens.  (Higginbottom Dep. 39-40).  Furthermore, all she remembers from those two conversations was that Couch and Ikens asserted that Plaintiffs lacked the adequate license to treat her son.  (*Id*.).  Finally, no where in the record is it asserted, nor can it be concluded, that Defendant "threatened" Ms. Higginbottom.  Ms. Higginbottom testified only that:

> Q:   What facilitated or necessitated[,] from your perspective[,] Gary being moved from The Healing Place to another facility?
>
> A:   You mean to Rainbow?
>
> Q:   To Rainbow.
>
> A:   To the new facility?  I believe it was the fact that State Farm had said they were not going to pay for that program anymore because of this licensure. I was a little concerned that Gary would have to pay for the amount of time he was there.

---

[5] Roman Frankel admitted that he had no information regarding whether Defendant "communicated its decision [not to pay for services] to any other insurance company".  (Def. Br. Ex. 4, Frankel Dep. at 83).  Mr. Frankel also admitted that Plaintiffs did not initiate any investigation to determine whether Defendant passed information regarding Plaintiffs' licensing to third parties.  (*Id*. at 82).

[6] The Court notes Plaintiffs allege there was a "contractual" relationship between Defendant's insured and Plaintiffs.  (Compl. ¶¶ 26-27).  Plaintiffs have not submitted any contract to evidence this.

20

(*Id*. 43:11-20.).

Moreover, given the *Naylor* decision, any statement made by Defendant regarding Plaintiffs' lack of proper licensure was made in good faith and not an attempt to wrongly steer defendant's insured away from Plaintiffs. That is, the conclusion reached in *Naylor*—that Plaintiffs were not properly licensed under the New Fault Act—wholly supports Defendant's argument that it was acting in good faith when it informed any third parties of Plaintiffs' licensing issues.

Accordingly, the Court grants Defendant summary judgment on Plaintiffs' tortious interference with a contractual relationship claim.

### E.  Business Defamation

Lastly, Plaintiffs claim that Defendant published false and defamatory statements regarding Plaintiffs to other insurance carriers and their employees, members of the professional community engaged in the care and treatment of victims of traumatic brain injury, patients, prospective patients, family members of prospective patients, and Michael Morgan.

In Michigan, "[t]he elements of a cause of action for defamation are: '(a) a false and defamatory statement concerning plaintiff; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod)." *Sawabini v. Desenberg*, 143 Mich. App. 373, 379 (1985) (citations omitted)

Plaintiffs' defamation claim against Defendant must fail. First, as pointed out by Defendant, truth is the ultimate defense to defamation. Because, under *Naylor*, Plaintiffs were not properly licensed for the services in which they provided, Plaintiffs were telling the truth when they allegedly

21

told numerous third parties that Plaintiffs were not licensed.

Second, Plaintiffs' defamation claim must fail because Defendant's publication was conditionally privileged. A person who publishes defamatory statements about another is not liable for the publication of those statements if the publication is conditionally privileged and the privilege is not abused.

> A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. . . . The essential elements of a conditionally privileged communication may accordingly be enumerated as [1] good faith, [2] an interest to be upheld, [3] a statement limited in its scope to this purpose, [4] a proper occasion, and [5] publication in a proper manner and to proper parties only.

*Timmins v. Bennett,* 352 Mich. 355, 369 (1958). Here, Defendant had an interest to communicate to its' insureds that the facilities providing treatment to the insureds are not properly licensed for the services for which they provided to the insured. As shown by Ms. Higginbottom's deposition testimony, the statements appear limited to this purpose, provided on a proper occasion, and made in a proper manner (non-threatening) and to proper parties (to the insureds and/or their guardians). Plaintiffs have not provided this Court with genuine issues of material fact to rebut such a finding.

Accordingly, the grants Defendant summary judgment on Plaintiffs' business defamation claim.

## III.     CONCLUSION

For the reasons stated, the Court **(1) LIFTS** the stay of proceedings and **(2) GRANTS** Defendant's Motion for Summary Judgment (Dkt. No. 36).

22

**SO ORDERED**.

S/Paul D. Borman

PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 30, 2009.

S/Denise Goodine

Case Manager